# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### Greensboro Division

| | |
|---|---|
| MARY DOE, by and through her mother and next friend, JANE DOE; BETH ROE, by and through her mother and next friend, ALICE ROE; DIANE POE, by and through her mother and next friend, CAROL POE, <br><br> *Plaintiffs*, <br><br> v. <br><br> CABARRUS COUNTY BOARD OF EDUCATION; and DR. JOHN KOPICKI, in his official capacity as Superintendent of Cabarrus County Schools, <br><br> *Defendants*. | Case No. 1:26-cv-00752 <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs Mary Doe, Beth Roe, and Diane Poe, each a minor appearing by and through her mother and next friend, Jane Doe, Alice Roe, and Carol Poe, respectively, bring this Complaint against Defendants and allege as follows:

### INTRODUCTION

1. This action challenges Defendants' policy of permitting biological males to access and use female restrooms, locker rooms, and changing room

1

facilities at Cox Mill High School in Cabarrus County, North Carolina, thereby violating the rights of Mary Doe, Beth Roe, and Diane Poe, and other female students under Title IX of the Education Amendments of 1972, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and Article I, Section 19 of the North Carolina Constitution.

2. "[S]ex-separation in bathrooms … preceded the nation's founding." W. Burlette Carter, *Sexism in the "Bathroom Debates": How Bathrooms Really Became Separated by Sex*, 37 YALE L. & POL'Y REV. 227, 229 (2018). Throughout history, societies separated restrooms by biological sex "in order to address privacy and safety concerns arising from the biological differences between males and females." *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 734 (4th Cir. 2016) (Niemeyer, J., concurring in part and dissenting in part), *vacated*, 580 U.S. 1168 (2017); Carter, *supra*, at 229. Sex-separated restroom facilities likewise were commonplace when the Fourteenth Amendment was ratified. Peter C. Baldwin, *Public Privacy: Restrooms in American Cities, 1869-1932*, 48 J. SOC. HIST. 264, 268 (2014).

3. Sex-separated restrooms became the norm in our Nation precisely to advance women's interest in privacy, dignity, and safety. Laws requiring separate restroom facilities for women were "among the earliest state-wide attempts to protect women from workplace sexual harassment." Carter, *supra*,

at 279. The adoption of women's restrooms also marked a significant achievement of the women's rights movement. *See* Kevin Stuart & DeAnn Barta Stuart, *Behind Closed Doors: Public Restrooms and the Fight for Women's Equality*, 24 TEX. REV. L. & POL. 1, 28-29 (2019). As then-Professor Ruth Bader Ginsburg explained in 1975, "[s]eparate places to disrobe, sleep, [and] *perform personal bodily functions* are permitted, in some situations required, by regard for individual privacy." Ruth Bader Ginsburg, *The Fear of the Equal Rights Amendment*, WASH. POST, Apr. 7, 1975, at A21 (emphasis added).

4.      Against this historical backdrop, the Supreme Court has repeatedly recognized that laws and policies distinguishing between males and females are not inherently unconstitutional. Although governmental classifications based on sex are subject to heightened scrutiny, the U.S. Constitution does not require the government to ignore the real biological differences between the sexes. To the contrary, the Court has long recognized that "[p]hysical differences between men and women … are enduring" and that those differences may justify sex-based distinctions. *United States v. Virginia*, 518 U.S. 515, 533 (1996). In fact, "[t]he point is illustrated by society's undisputed approval of separate public rest rooms for men and women based on privacy concerns. The need for privacy justifies separation and the

3

differences between the genders demand a facility for each gender that is different." *Faulkner v. Jones*, 10 F.3d 226, 232 (4th Cir. 1993).

5. Consistent with that principle, the Supreme Court recently affirmed that separating school sports based on biological sex serves important governmental interests. Those interests include protecting the dignity and safety of women and girls. *See West Virginia v. B.P.J. ex rel. Jackson*, No. 24-43, slip op. at 17 (June 30, 2026) (providing that "the interests in safety and competitive fairness are important for purposes of equal protection analysis" and that "forcing women and girls to play against biological males can deter some women and girls who would otherwise participate in sports from doing so—out of understandable concern about … participating in what they view as an unfair competition"). These longstanding constitutional principles foreclose any contention that Defendants are required by law to abandon sex-separated intimate facilities.

6. Mary Doe, Beth Roe, and Diane Poe are minor female students at Cox Mill High School who have been subjected to the presence of biological males in their school restrooms, locker rooms, and changing areas. Mary Doe and Beth Roe reported their discomfort and objections to school administrators, who told them the school could do nothing and that the policy was required by law. Diane Poe did not raise her objections because her team

4

coach communicated that any student who objected to the policy or the full participation of transgender students should quit the team, causing her to reasonably believe that speaking out would jeopardize her participation in school athletics. Rather than protect its female students' privacy and safety, Cabarrus County Schools placed the burden on those students to use alternative facilities while permitting biological males to continue using intimate spaces designed and designated for girls.

7. Plaintiffs seek declaratory and injunctive relief, as well as compensatory and nominal damages, to remedy these ongoing violations of federal and state law.

## JURISDICTION AND VENUE

8. This action arises under the Fourteenth Amendment to the U.S. Constitution and Title IX of the Education Amendments of 1972, 20 U.S.C. §1681(a), and is brought via 42 U.S.C. §§1983 and 1988. Plaintiffs also assert a claim under Article I, Section 19 of the North Carolina Constitution.

9. The Court has subject-matter jurisdiction over the federal constitutional claims pursuant to 28 U.S.C. §§1331 and 1343(a)(3).

10. The Court has subject-matter jurisdiction over the state-law claims pursuant to 28 U.S.C. §1367 because these claims are sufficiently

5

related to the federal claims in this action such that they form part of the same case or controversy.

11. This Court has the authority to award damages pursuant to 28 U.S.C. §1343(a), as well as costs and attorneys' fees under 42 U.S.C. §1988.

12. Venue is proper in this Court under 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

## PARTIES

### A. Plaintiffs

13. Plaintiff Mary Doe is a minor female student currently enrolled at Cox Mill High School in Concord, North Carolina. She brings this action by and through her mother and next friend, Jane Doe.

14. Plaintiff Beth Roe is a minor female student currently enrolled at Cox Mill High School in Concord, North Carolina. She brings this action by and through her mother and next friend, Alice Roe.

15. Plaintiff Diane Poe is a minor female student currently enrolled at Cox Mill High School in Concord, North Carolina. She brings this action by and through her mother and next friend, Carol Poe.

### B. Defendants

16. Defendant Cabarrus County Board of Education (the "School Board") is a governmental entity authorized by the State of North Carolina to

6

administer Cabarrus County Schools, including Cox Mill High School. N.C. Gen. Stat. §115C-40.

17. The School Board's principal place of business is 4401 Old Airport Road, Concord, North Carolina 28025.

18. The School Board is a recipient of federal financial assistance and is subject to Title IX of the Education Amendments of 1972.

19. Defendant Dr. John Kopicki is and was, at all times mentioned herein, the Superintendent of Cabarrus County Schools acting under color of state law.

20. Defendant Kopicki is responsible for adopting and implementing the School Board's and Cabarrus County Schools' policies and practices, including the challenged policies and practices described in this Complaint. Defendant Kopicki is sued in his official capacity.

## FACTS

### A. Mary Doe

21. Plaintiff Mary Doe is, and at all relevant times has been, a student at Cox Mill High School in Cabarrus County, North Carolina.

22. Mary Doe is seventeen years old.

23. Jane Doe is Mary Doe's mother and next friend.

24. Mary Doe is a practicing Christian who strives to live in accordance with her faith.

25. Her sincerely held Christian faith informs her understanding of modesty, privacy, and bodily dignity, and she believes that maintaining privacy from biological males in intimate settings is an important part of living out those beliefs.

26. On or about October 1, 2025, Mary Doe learned that a biological male was accessing and using the female-designated restrooms, locker rooms, and changing areas at Cox Mill High School.

27. On November 19, 2025, Jane Doe emailed Defendant Kopicki to report that her daughter was distressed by Cox Mill High School's policy permitting biological males to access and use female-designated intimate facilities, including restrooms, locker rooms, and changing areas used by her daughter. Neither Defendant Kopicki nor any other school official responded to Jane Doe's email.

28. On or about December 1, 2025, Mary Doe encountered a biological male using the female restroom at Cox Mill High School. The encounter caused Mary Doe to feel uncomfortable, vulnerable, and anxious about encountering a biological male in the female restroom in the future.

8

29. On or about December 1, 2025, Mary Doe spoke to Brad Hinson, the Athletic Director at Cox Mill High School. She explained that she was extremely uncomfortable being required to share female-designated intimate facilities with biological males. Mr. Hinson informed Mary Doe that other female students had raised similar concerns but stated that the matter would have to be addressed by the school's principal.

30. On or about December 1, 2025, Mary Doe met with Christopher Myers, the then-principal of Cox Mill High School, to express her concerns about biological males being permitted to use female-designated restrooms and other intimate facilities. During that meeting, the principal offered to provide Mary Doe with a staff restroom key so she could use a separate restroom rather than the female student restroom. The principal stated that other students had come to him with similar concerns.

31. Mary Doe did not use the staff restrooms. The staff restrooms are not conveniently located. Female student restrooms are located on both the upper and lower floors of the school building, but there are no staff restrooms on the lower floor. The staff restrooms located on the upper floor were located far from Mary's classrooms. In addition, using restrooms designated for adult staff instead of the female student restrooms would have singled Mary Doe out from her peers and caused her embarrassment.

9

32. To Mary Doe's knowledge, Principal Myers did not offer the biological male student the use of a staff restroom key so that student could use a separate restroom rather than the female-designated student restroom.

33. Mary Doe encountered a biological male in the restroom on at least two additional occasions before the end of the 2025–2026 school year.

34. As a result of these encounters and Cox Mill High School's refusal to prevent biological males from accessing female-designated restrooms, Mary Doe stopped using the restrooms at school whenever possible.

35. Mary Doe's avoidance of the school restrooms has caused, and will continue to cause, physical discomfort and poses a risk to her health and well-being. This has impaired Mary Doe's personal dignity.

36. On or about June 11, 2026, the Does met with Dr. Meghan Frazier, the new and current principal of Cox Mill High School, to discuss Mary's experiences and concerns, as well as a plan for the upcoming school year. During that meeting, Dr. Frazier proposed developing a plan under which Mary Doe would use staff restrooms rather than the female student restrooms. Dr. Frazier indicated that if using the staff restrooms resulted in Mary being late to class, her tardiness would be excused.

37. Jane Doe asked Dr. Frazier why female students who objected to sharing intimate facilities with biological males were expected to use separate

restrooms while biological males who identify as transgender continued to be permitted to use female-designated restrooms.

38. Dr. Frazier responded that the school's policy is required by law.

39. Based on this response, the Does understood that school officials would not consider their request for sex-separated facilities because school officials believed they were required to allow biological males who identify as transgender to use the female restroom.

**B.    Beth Roe**

40. Plaintiff Beth Roe is, and at all relevant times has been, a student at Cox Mill High School in Cabarrus County, North Carolina.

41. Beth Roe is, and intends to remain, a member of a girls' sports team at Cox Mill High School.

42. Beth Roe is seventeen years old.

43. Alice Roe is Beth Roe's mother and next friend.

44. Beth Roe is a practicing Christian who strives to live in accordance with her faith.

45. Her sincerely held Christian faith informs her understanding of modesty, privacy, and bodily dignity, and she believes that maintaining privacy from biological males in intimate settings is an important part of living out those beliefs.

11

46.     On or about April 23, 2025, Beth Roe encountered a biological male in the changing area designated for the girls' sports team of which she is a member.

47.     Beth Roe was extremely uncomfortable sharing the changing area with a biological male, so she left the designated changing area and changed in the closest available restroom.

48.     The next day, on April 24, 2025, Beth Roe emailed the principal and assistant principal of Cox Mill High School, the school's athletic director, and her team's coach to express her concerns about a biological male being permitted to undress with female students. She explained that she was uncomfortable with the arrangement, believed it was inappropriate, and had consequently changed her clothes in a restroom rather than in the designated team changing area. She further explained that she should not be required to seek an alternative place to undress because of the school's policy and asked whether the school would provide female students with a female-only changing area at future practices.

49.     Later that day, then-Principal Christopher Myers called Beth Roe into his office and told her that, although he was sympathetic to her concerns, there was nothing he could do because the policy was required by law.

50. Since that time, Beth Roe has continued to change her clothes in a single stall restroom rather than in the designated team changing area, seeking to avoid undressing in the presence a biological male. However, under Defendants' policy, biological males are also permitted to use the girls' restrooms.

51. Those single stall restrooms are located away from the team's designated changing area, making them a significantly less convenient and practical alternative. On several occasions, Beth Roe needed to change clothes multiples times during a single showcase, requiring her to repeatedly walk to a distant single-stall restroom rather than use the team's designated changing area. On those occasions, the additional time and effort required to change clothes has made that process rushed, stressful, and unnecessarily burdensome.

52. Beth Roe intends to continue participating in school sports during the upcoming 2026–2027 school year.

**C. Diane Poe**

53. Plaintiff Diane Poe is, and at all relevant times has been, a student at Cox Mill High School in Cabarrus County, North Carolina.

54. Diane Poe was, and intends to be in the future, a member of several sports teams at Cox Mill High School.

13

55. Diane Poe is seventeen years old.

56. Carol Poe is Diane Poe's mother and next friend.

57. Diane Poe is a practicing Christian who strives to live in accordance with her faith.

58. Her sincerely held Christian faith informs her understanding of modesty, privacy, and bodily dignity, and she believes that maintaining privacy from biological males in intimate settings is an important part of living out those beliefs.

59. Throughout the 2024–2025 school year, Diane Poe regularly encountered a biological male—often daily—in the female-designated locker rooms for her sports team.

60. Diane Poe felt extremely uncomfortable undressing in the presence of a biological male.

61. Throughout the 2024–2025 school year, Diane Poe considered raising her concerns with her coaches and school administrators.

62. Diane Poe ultimately decided not to raise her concerns because in the spring of 2025, a sports coach told the team that any team member who disagreed with allowing transgender-identifying individuals to participate on the team should quit.

14

63. Because of the coach's comments and the discomfort and loss of privacy Diane Poe experienced in the female locker room, Diane Poe decided not to try out for that team the following school year.

64. In the 2025–2026 school year, Diane Poe was enrolled in a physical education course that required students to wear athletic clothing. The girls' locker room was available to female students enrolled in the course so that they could change clothes at school.

65. In the spring of 2026, while changing for class, Diane Poe encountered a biological male—on a nearly daily basis—in the female locker room and changing areas designated for female members of her physical education class and other girls' sports teams. Diane Poe felt extremely uncomfortable and vulnerable undressing in the presence of a biological male.

66. On multiple occasions in the 2025-2026 school year, to avoid undressing in front of a biological male, Diane wore athletic clothes to school so that she would not need to use the locker room to change clothes for her class.

67. In the 2025–2026 school year, Diane Poe encountered a biological male in the female restroom. The encounter caused Diane Poe to feel uncomfortable, vulnerable, and anxious about encountering another in the restroom.

68. As a result of Defendants' policy and the coach's comments, Diane Poe does not believe she can continue participating in sports at school without compromising her modesty and enduring deep feelings of anxiety, vulnerability, and discomfort.

**D. Cabarrus County Schools' Policies and Practices**

69. Upon information and belief, it is the policy and practice of Cabarrus County Schools to permit biological males to access and use female restrooms, locker rooms, and changing areas. Cabarrus County Schools' officials uniformly implement a district-wide practice of permitting students to access intimate and private facilities based on gender identity rather than biological sex. To Plaintiffs' knowledge, no biological female currently uses the restrooms and intimate facilities designed for male students.

70. Throughout the 2024–2025 and 2025–2026 school years, Cabarrus County Schools consistently maintained this policy and practice despite repeated complaints from students and parents.

71. Parents and students have repeatedly expressed concerns at Cabarrus County Board of Education meetings regarding Cabarrus County Schools' policy permitting biological male students to access restrooms, locker rooms, and changing areas designed and designated for female students.

16

72. In October 2024, a Cabarrus County Schools official gave the following statement to the media: "Cabarrus County Schools does not have a specific policy regarding this matter. Our priority is to ensure that all of our students feel safe and supported. As such, we will continue to provide appropriate bathroom accommodations to any student who may feel uncomfortable." Glenn Counts, *Parents Seek Bathroom Protections for Kids*, WSOC-TV (Oct. 16, 2024, at 22:24 EDT), https://perma.cc/JR38-52L7.

73. At the April 13, 2026, Cabarrus County Board of Education meeting, following months of community members expressing concerns to Defendants about its practice allowing males to access private female facilities, Cabarrus County Schools Board attorney William Isenhour made the following statement about the School Board's interpretation of Title IX:

> The Cabarrus County Board of Education is required to comply with applicable federal and state laws regarding all of its operations. These laws can vary from employment matters to construction matters to student matters. I've been asked tonight to provide information during this open session regarding Title IX, which is the federal law that prohibits educational institutions, that receive federal funds, from sex-based discrimination. There is a legal decision involving Title IX that public school boards in North Carolina must follow. That is *Grimm v. Gloucester County School Board*. That was a court case involving a transgender student attending a Virginia high school who sued the local school board after the student was forced to use the school bathroom based on the student's biological sex. In 2020, the Fourth Circuit Court of Appeals, which interprets federal law as applied in North Carolina, ruled against the local school board in the *Grimm* case and held that as a matter of law, it is a violation of Title IX for a

17

school board to have a policy requiring a transgender student to use the bathroom consistent with their biological sex. To do so, according to the Fourth Circuit, constitutes sex-based discrimination. There are many people in this county who agree or disagree with the *Grimm* decision. Both perspectives are entitled to their opinions, and individuals have the right under the First Amendment of the U.S. Constitution to peacefully petition their elected officials to change laws they disagree with. What neither side has the right to do is to expect or require elected officials to violate the law. So whether one agrees or disagrees with *Grimm*, the Cabarrus County Board of Education is obligated to comply with the decision. Cabarrus County Schools do not have a separate bathroom policy as some school systems do. Our existing Board policies are intended to provide a safe, respectful, and non-discriminatory environment to protect the rights, safety, and privacy of all students, consistent with applicable law. In the student bathroom context, this means that the small number of transgender students who are uncomfortable using a male- or female-only facility may opt to use a single-user or private bathroom. In the even rarer instance that a transgender student opts to use a bathroom that does not correspond to their biological sex, the district addresses the situation at each school on a case-by-case basis with the goal of addressing concerns of all students and their families. ... [T]his Board will continue to carefully monitor the developments in this area including changes or clarification in the law and will make any necessary policy changes. When there's a lack of clarity about the scope and reach of the law, the Board and its legal counsel, in consultation with local, state, and federal authorities, will continue to strive to fashion policies and procedures that consider the current state of the law without compromising the interests of our students.

Cabarrus County Schools, *BOE Business Meeting Adoption of 2026-27 Budget.*

*Edited to Beep Out Prohibited Language*, at 1:16:44-1:20:28 (YouTube, Apr. 15, 2026), https://youtu.be/5BO17lgPdAQ&t=4604.

74. Historically, Cabarrus County Schools provided, and federal law expressly authorizes, separate restrooms, locker rooms, and changing areas for members of each sex.

75. By all accounts, Cabarrus County Schools continues to permit biological males to access female-designated restrooms, locker rooms, and changing areas not because Cabarrus County Schools *wants* to do so, but rather because it believes *it has no choice* but to do so. In other words, no amount of complaints from parents, students, and the community at large can ever change the policy, and no incident where a young girl is put at risk will change the policy. The only thing that will cause Cabarrus County Schools to change its policy is a court telling it that the law permits it to do so.

76. Because of this, Plaintiffs reasonably expect that they will again encounter biological males in those facilities during the upcoming school year absent judicial relief.

## COUNT I
### Violation of Title IX of the Education Amendments of 1972
### 20 U.S.C. §§1681–1688
### *(Against the School Board)*

77. Plaintiffs incorporate the foregoing paragraphs as though fully restated here.

78. The School Board receives federal financial assistance and is therefore subject to the requirements of Title IX.

19

79. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance," with limited exceptions not relevant here. 20 U.S.C. §1681(a).

80. By its plain terms, Title IX prohibits discrimination on the basis of biological sex.

81. The Supreme Court recently made clear that "[t]he term 'sex' in the 1972 Title IX statute … and the 1975 Title IX regulations cannot plausibly be interpreted to refer to anything other than biological sex." *B.P.J. ex rel. Jackson*, slip op. at 10.

82. "Title IX allows schools to provide separate women's and men's sports teams defined by biological sex." *Id.* at 14; *accord id.* at 4 (Gorsuch, J., concurring) ("Title IX anticipates and approves single-sex living accommodations and sports teams in school settings; it does not treat them as unlawful discrimination."). Indeed, Title IX itself states that "nothing" in the statute "shall be construed to prohibit" sex-separated living facilities. 20 U.S.C. §1686. The implementing regulations—issued contemporaneously with the statute and left undisturbed for nearly fifty years—expressly authorize

20

"separate toilet, locker room, and shower facilities on the basis of sex." 34 C.F.R. §106.33.

83. Defendants provide restrooms, locker rooms, and changing rooms that are segregated by sex and are labeled as such.

84. Defendants provide an exception to the sex-based separation of restrooms, locker rooms, and changing rooms by permitting students to access and use the facilities that correspond to their asserted gender identity rather than their biological sex.

85. Plaintiffs are biological females, identify as females, and have never identified as males. Plaintiffs are therefore permitted only to access and use the female-designated restrooms, locker rooms, and changing room facilities.

86. On multiple occasions, Plaintiffs encountered biological males in the female-designated restrooms, locker rooms, and changing room facilities. These encounters caused Plaintiffs to feel uncomfortable and distressed because their privacy and dignity were compromised.

87. In response to Plaintiffs' concerns, Defendants directed them to use staff restrooms or to change in restrooms located farther away from their sports team activities. The staff restrooms are inconveniently located and require Plaintiffs to separate themselves from their peers, exposing them to

21

stigmatization and ostracization. And the alternative changing areas remain accessible to biological males under Defendants' policies.

88. Under Defendants' policy, if a female student utilizing the supposedly sex-segregated student facilities suddenly finds herself sharing a restroom or disrobing with a biological male who the school has permitted to enter the female facility, the burden falls on the female student—not the biological male—to leave the female student facility and use a separate facility designed for use by adult staff members.

89. As a result, Plaintiffs—biological females who identify as female—have to make choice: either abandon their interest in privacy and modesty so that they can remain with their female classmates in the common female facilities, or leave those common facilities to use a not-comparable facility separate from their female classmates. The biological male student, meanwhile, is faced with no such choice. Worse yet, that biological male student has the option of using either the common male facilities *or* the common female facilities. The biological male student is never faced with the dilemma forced upon the biological female student.

90. In short, Defendants condition a female student's equal use and enjoyment of school facilities on her willingness to surrender the privacy interests that female-only spaces are created and designed to protect.

22

91.     By prioritizing a biological male students' access to female facilities over Plaintiffs' equal access to sex-separated intimate spaces, Defendants discriminate against Plaintiffs' on the basis of sex in violation of Title IX.

92.     By permitting biological males to use female-designated restrooms, locker rooms, and changing areas, Defendants have excluded Plaintiffs from participation in, denied them the benefits of, and subjected them to discrimination under Defendants' education programs and activities.

93.     In *Grimm v. Gloucester County School Board*, the Fourth Circuit held that excluding a transgender-identifying student from bathroom facilities designated for the opposite sex violated Title IX because "sex" as used in Title IX and its 1975 regulations was not limited to biological sex but also included gender identity. 972 F.3d 586, 593-94, 618-19 (4th Cir. 2020). The Supreme Court has since rejected the legal premise underlying *Grimm*, holding that "[t]he term 'sex' in the 1972 Title IX statute, the 1974 Javits Amendment, and the 1975 Title IX regulations cannot plausibly be interpreted to refer to anything other than biological sex." *B.P.J. ex rel. Jackson*, slip op. at 10; *see also id.* ("The ordinary meaning of the term 'sex' at the time of enactment in the early 1970s was biological sex and not gender identity[.]").

23

94. Accordingly, *Grimm* can no longer be regarded as controlling on that issue. *See James v. City of Boise*, 577 U.S. 306, 307 (2016) (per curiam) ("'It is [the Supreme] Court's responsibility to say what a [federal] statute means, and once the Court has spoken, it is the duty of other courts to respect that understanding of the governing rule of law.'"); *Payne v. Taslimi*, 998 F.3d 648, 654 (4th Cir. 2021) ("As an inferior court, the Supreme Court's precedents do constrain us. … We must simply apply their commands.").

95. Plaintiffs reported the presence of biological males in female-designated intimate facilities to school administrators, athletic directors, and Defendant Kopicki. Despite receiving actual notice of these conditions, the School Board failed to take any corrective or remedial action and was deliberately indifferent to the known violations of Plaintiffs' rights under Title IX.

96. The School Board's deliberate indifference to the discrimination experienced by Plaintiffs was objectively unreasonable considering the known circumstances.

97. Plaintiffs will suffer ongoing, irreparable harm to their rights unless Defendants are enjoined from implementing and enforcing their discriminatory policies against Plaintiffs.

24

## COUNT II
## Violation of the Equal Protection Clause
## of the Fourteenth Amendment to the U.S. Constitution
### *(Against the School Board and Defendant Kopicki)*

98. Plaintiffs incorporate the foregoing paragraphs as though fully restated here.

99. The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, §1.

100. Defendants have adopted and implemented a policy and practice of permitting students to access and use the restroom, locker room, and changing room facilities that correspond to their gender identity rather than their biological sex.

101. Plaintiffs are biological females, identify as females, and have never identified as males. Plaintiffs are therefore permitted only to access and use the female-designated restrooms, locker rooms, and changing room facilities.

102. On multiple occasions, Plaintiffs encountered biological males in the female-designated restrooms, locker rooms, and changing room facilities. These encounters caused Plaintiffs to feel uncomfortable and distressed because their privacy and dignity were compromised.

25

103. In response to Plaintiffs' concerns, Defendants directed them to use adult staff restrooms or to change in restrooms located farther away from their sports team activities. The staff restrooms are inconveniently located and require Plaintiffs to separate themselves from their peers, exposing them to stigmatization and ostracization. And the alternative changing areas remain accessible to biological males under Defendants' policies.

104. Defendants' policies and practices subject Plaintiffs to intentional discrimination on the basis of sex by placing the asserted interest of biological male students in using female-designated spaces above Plaintiffs' interest in bodily privacy when using those spaces.

105. Under the policy, when a female student is uncomfortable sharing an intimate space, such as a restroom, with a biological male, she—not the biological male—bears the burden of leaving the common female restroom to use a separate facility designated for use by adult staff.

106. The practical effect of the policy is that the female student is denied access to female-only facilities, while a similarly situated biological male retains full access to the female-only facilities, as well as the facilities reserved for his biological sex. In other words, the policy conditions a female student's equal use and enjoyment of school facilities on her willingness to give

26

up the very privacy interests that female-only spaces exist to protect. That result is sex discrimination.

107. Defendants' policy requires Plaintiffs—not the biologically male students who sought access to the girls' restroom—to alter their behavior by using a separate, less convenient facility because of their sex-based privacy objections. In other words, where a conflict arose between one student's asserted interest in using the girls' restroom and another student's interest in bodily privacy in a sex-segregated restroom, the school accommodated the former and undermined the privacy interest of the latter.

108. Policies or "laws that classify by sex are subject to what is known as intermediate scrutiny: Sex-based classifications are permissible only when the classification is 'substantially related' to achieving an 'important' government objective." *B.P.J. ex rel. Jackson*, slip op. at 15.

109. Defendants treat the Plaintiffs worse than biological males who seek to use the female-designated facilities, and their actions are not substantially related to any important government interest.

110. To the extent Defendants' policy operates asymmetrically in practice, it additionally constitutes a discriminatory sex classification. The policy only applies to female-designated facilities, as no biological female students currently use the restrooms and intimate facilities designed for male

27

students. Thus, the entire burden of the policy falls on female students, who must either accept the presence of biological males in their intimate spaces, or use a separate restroom. Male students, by contrast, may continue to use male-designated intimate facilities with only members of their sex, and do not have to use a separate restroom to protect their bodily privacy. Policies that impose requirements on female students that are not imposed on male students are constitutionally suspect. *See Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 126 (4th Cir. 2022) (holding that school requirement that female students must wear skirts violated the Equal Protection Clause).

111.    In *Grimm v. Gloucester County School Board*, the Fourth Circuit held that excluding a transgender-identifying student from bathroom facilities designated for the opposite sex violated the Equal Protection Clause because the use of biological sex as a classification was an improper sex stereotype. 972 F.3d 586, 593, 608. The Supreme Court has since rejected the legal premise underlying *Grimm*, holding that separation based on biological sex passes intermediate scrutiny where related to an important government interest. *B.P.J. ex rel. Jackson*, slip op. at 12. Accordingly, *Grimm* can no longer be regarded as controlling on that issue.

112. As a direct and proximate result of Defendants' violations, Plaintiffs have suffered and continue to suffer emotional distress, anxiety,

28

humiliation, loss of educational opportunities, and deprivation of their constitutional right to equal protection.

113. Plaintiffs have no adequate remedy at law and suffer ongoing, irreparable harm to their rights unless Defendants are enjoined from implementing and enforcing their discriminatory policies against Plaintiffs.

**COUNT III**
**Violation of the North Carolina Constitution's**
**Equal Protection Clause**
**Article I, Section 19**
***(Against the School Board and Defendant Kopicki)***

114. Plaintiffs incorporate the foregoing paragraphs as though fully restated here.

115. Article I, Section 19 of the North Carolina Constitution provides in relevant part that "[n]o person shall be denied the equal protection of the laws." N.C. Const. art. I, §19. This clause is known as the Equal Protection Clause.

116. Sex-based classifications are subject to intermediate scrutiny, requiring the State to prove that the classification is substantially related to an important government interest. *Dep't of Transp. v. Rowe*, 549 S.E.2d 203, 207 (N.C. 2001).

117. Defendants' policy and practices discriminate on the basis of sex against female students who object to sharing intimate facilities with biological males.

29

118. Under the policy, when a female student is uncomfortable sharing an intimate space, such as a restroom, with a biological male, she—not the biological male—bears the burden of leaving the common female restroom to use a separate, private facility. In other words, Plaintiffs are required to alter their behavior by using a separate, less convenient facility because of their sex-based privacy objections. Where a conflict arose between one student's asserted interest in using the girls' restroom and another student's interest in bodily privacy in a sex-segregated restroom, the school accommodated the former and undermined the privacy interest of the latter.

119. This sex-based classification is not substantially related to any important government interest. No compelling or legitimate interest justifies Defendants' decision to deny female students access to single-sex intimate facilities free from the presence of biological males.

120. To the extent Defendants' policy operates asymmetrically in practice, it additionally constitutes a discriminatory sex classification. The policy only applies to female-designated facilities, as no biological female students currently use the restrooms and intimate facilities designed for male students. Thus, the entire burden of the policy falls on female students, who must either accept the presence of biological males in their intimate spaces, or use a separate restroom. Male students, by contrast, may continue to use male-

30

designated intimate facilities with only members of their sex, and do not have to use a separate restroom to protect their bodily privacy. Policies that impose requirements on female students that are not imposed on male students are constitutionally suspect. *Peltier*, 37 F.4th at 126 (holding that school requirement that female students must wear skirts violated the Equal Protection Clause).

121. As a direct and proximate result of Defendants' violations of Article I, Section 19, Plaintiffs have suffered and will continue to suffer harm, including emotional distress, anxiety, humiliation, and loss of privacy.

122. Plaintiffs have no adequate remedy at law and suffer ongoing, irreparable harm to their rights unless Defendants are enjoined from implementing and enforcing their discriminatory policies against Plaintiffs.

123. No adequate state remedy exists to provide relief for Defendants' violation of the North Carolina Constitution.

124. Plaintiffs are entitled to declaratory, injunctive, and monetary relief.

**COUNT IV**
**Municipal Liability Under *Monell***
***(By Plaintiffs Against the School Board)***

125. Plaintiffs incorporate the foregoing paragraphs as though fully restated here.

31

126. Local government bodies like the School Board are "persons" for purposes of Section 1983 and therefore may be sued under federal law for violations of constitutional rights. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).

127. The School Board is liable under *Monell* for constitutional violations that result from: (a) an official policy or custom; (b) actions by officials with final policymaking authority; or (c) inadequate training or supervision amounting to deliberate indifference. *See id.* at 694; *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

128. The violations of Plaintiffs' constitutional rights described in this Complaint were caused by Defendants' official policies, regulations, customs, and practices, as well as inadequate training or supervision amounting to deliberate indifference.

129. The School Board's implementation and enforcement of its bathroom, locker room, and changing room policies and practices directly result in the ongoing violations of Plaintiffs' equal-protection rights. These policies and customs were established and are maintained by officials with final policymaking authority, including the School Board.

130. The School Board's policies and customs were the moving force behind the constitutional violations suffered by Plaintiffs.

32

131. Furthermore, the School Board's inadequate training and supervision of administrators regarding these policies constitute deliberate indifference to Plaintiffs' equal-protection rights and lead to a custom of constitutional violations.

132. The inadequate training and supervision of administrators regarding these policies stem from the School Board's deliberate decision to permit students to use the restroom, locker room, and changing rooms of their choice, regardless of biological sex.

133. The School Board's inadequate training and supervision of administrators and staff contributed significantly to the constitutional violations suffered by Plaintiffs.

134. As a result of the School Board's policies and customs, as well as its inadequate training and supervision of Cabarrus County Schools' personnel, Plaintiffs suffered violations of their equal-protection rights, and sustained damages, including emotional distress and other injuries.

## PRAYER FOR RELIEF

135. Plaintiffs request that the Court enter the following relief:

    a. A declaratory judgment that a policy requiring students to use the bathroom and other intimate facilities that correspond with their

biological sex does not violate Title IX or the Equal Protection Clause of the U.S. Constitution;

b. A declaratory judgment that Defendants' policies and practices violate Title IX, the Equal Protection Clause of the U.S. Constitution, and Article I, Section 19 of the North Carolina Constitution;

c. A preliminary and permanent injunction requiring Defendants to provide Plaintiffs access to sex-segregated locker rooms, changing areas, showers, bathrooms, and other similar intimate places, and to do so without conditioning access on Plaintiffs segregating themselves from their classmates or teammates, being excluded from team or class activities, traveling to distant or inferior facilities, or bearing any other burden not borne on students generally;

d. Compensatory damages under 42 U.S.C. §1983 and any other applicable statute for emotional pain and distress, mental anguish, humiliation, loss of enjoyment of life, and other non-economic harm, in an amount to be proven at trial;

e. Nominal damages;

f. Pre-judgment and post-judgment interest as allowed by law;

34

g. Reasonable attorneys' fees and costs of this action pursuant to 42 U.S.C. §1988 and any other applicable statute; and

h. Any other relief that this Court deems proper.

Dated: July 31, 2026

Respectfully submitted,

Rachael Tucker Wyrick*
Julius I. Kairey*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, Virginia 22209
Phone: (703) 243-9423
rachael@consovoymccarthy.com
julius@consovoymccarthy.com

*/s/ Laura Stell*
Laura Stell (NC Bar No. 59840)
Ian D. Prior*
Crystal Clanton*
Rachael Griffin*
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave SE #231
Washington, DC 20003
Phone: (202) 964-3721
laura.stell@aflegal.org
ian.prior@aflegal.org
crystal.clanton@aflegal.org
rachael.griffin@aflegal.org

*Counsel for Plaintiffs*

*Special appearance forthcoming