**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| MARY DOE, by and through her mother and next friend, JANE DOE; BETH ROE, by and through her mother and next friend, ALICE ROE; DIANE POE, by through her mother and next friend, CAROL POE,<br><br>*Plaintiffs*,<br><br>v.<br><br>CABARRUS COUNTY BOARD OF EDUCATION; and DR. JOHN KOPICKI, in his official capacity as Superintendent of Cabarrus County Schools,<br><br>*Defendants*. | Case No. 1:26-cv-00752 |

**<u>BRIEF OF AMICI CURIAE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION</u>**

## INTEREST OF AMICI CURIAE[1]

The American Civil Liberties Union (ACLU) is a nationwide, nonprofit, nonpartisan organization dedicated to the principles of liberty and equality embodied in the Constitution and our nation's civil rights laws. The ACLU of North Carolina Legal Foundation ("ACLU of North Carolina") is one of its state affiliates. Together, the ACLU and ACLU of North Carolina work in courts, legislatures, and communities to defend and preserve the individual rights and liberties that the Constitution and the laws of the United States guarantee everyone in this country, including LGBTQ people. In particular, the ACLU has litigated landmark cases regarding the rights of transgender students under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, and the Equal Protection Clause of the Fourteenth Amendment, including *West Virginia v. B.P.J. by Jackson*, 146 S. Ct. 2356 (2026); *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020); *Parents for Privacy v. Barr*, 949 F.3d 1210 (9th Cir. 2020); and *Doe v. Boyertown Area School Dist.*, 897 F.3d 518, 527, 531 (3rd Cir. 2018). *Amici* have a strong interest in the proper interpretation of those precedents.

## INTRODUCTION

Plaintiffs ask this Court to issue not one but two unprecedented holdings. First, they ask this Court to leapfrog ahead of the Fourth Circuit and declare that the court's binding precedent in *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), *as amended*

---

[1] Pursuant to Local Rule 7.5(d) *amici* affirm that no counsel for a party authored this brief, in whole or in part, and no person other than *amici* and their counsel made any monetary contribution to fund the preparation or submission of this brief.

(Aug. 28, 2020)—which held that Title IX and the Equal Protection Clause prohibit schools from categorically excluding transgender students from restrooms consistent with their gender identity—has been abrogated by *West Virginia v. B.P.J. by Jackson*, 146 S. Ct. 2356 (2026). Second, Plaintiffs ask the Court to issue an unprecedented holding that Title IX and the Equal Protection Clause not only *allow* but *require* schools to exclude transgender students from those facilities. Neither request is warranted.

The Fourth Circuit places a heavy burden on parties seeking to disregard binding circuit precedent based on intervening Supreme Court decisions. Under that standard a Supreme Court decision overrules or abrogates Fourth Circuit precedent only when it is *impossible* to reconcile the two decisions with each other. But *Grimm* and *B.P.J.* are easily reconcilable. The Supreme Court repeatedly emphasized in *B.P.J.* that its analysis focused on the special characteristics of school sports. School sports are "zero sum" where providing an opportunity to one student inherently denies an opportunity to another. And school sports are a rare context in which it was uncontested that sex-separation is justified based on biological sex-based differences, specifically differences related to athletic competition and safety. Because neither of those special characteristics applies to sex-separated restrooms, the Supreme Court's analysis of sports in *B.P.J.* does not necessarily extend to this very different context. The Supreme Court may (or may not) ultimately extend *B.P.J.*'s holding from sports to restrooms, but until then "[t]he bottom line is that *Grimm* is binding until the Supreme Court tells us otherwise." *Doe by Doe v. South Carolina*, No. 25-1787, 2025 WL 2375386, at *11 (4th Cir. Aug. 15, 2025).

Moreover, even if Plaintiffs could establish that *Grimm* is no longer binding and that Title IX and the Equal Protection Clause *allow* schools to exclude transgender students from restrooms consistent with their gender identity, Plaintiffs still could not show a likelihood of success on their claims that Title IX and the Equal Protection Clause *require* schools to do so. No court has ever held that Title IX or the Equal Protection Clause mandates such exclusion from sex-separated facilities—and with good reason. Plaintiffs challenge a policy that allows transgender students on a case-by-case basis to use restrooms and locker rooms consistent with their gender identity because the policy allows transgender girls (i.e. girls with a female gender identity who were assigned male at birth) to use the same facilities as cisgender girls. But the policy also applies to boys' facilities and is therefore sex-neutral. It does not subject anyone to disparate treatment based on their sex but rather classifies based on gender identity, which Plaintiffs insist is *not* a sex classification under either Title IX or the Equal Protection Clause. With no claim of disparate treatment based on sex, the policy easily survives rational basis review. Under that deferential standard, it was certainly rational for the school district to conclude that the best way to protect the health, wellbeing, and privacy of all students is to allow transgender students, on a case by case basis, to use restrooms consistent with their gender identity while providing alternative options for any student who wishes for greater privacy or who is uncomfortable with the presence of someone else in the common restroom with them.

# ARGUMENT

## I. *B.P.J.* DID NOT ABROGATE *GRIMM*.

Plaintiffs' claims are foreclosed by *Grimm*, which held that Title IX and the Equal Protection Clause prohibit schools from categorically excluding transgender students from restrooms consistent with their gender identity. Just last year, the Fourth Circuit reversed a district court for failing to apply *Grimm* when determining whether a transgender student was likely to prevail in challenging his exclusion from boys' restrooms. *See Doe*, 2025 WL 2375386, at *8. The Fourth Circuit explained that district courts could not disregard *Grimm* based on their assessment that the law is in flux or that the Supreme Court would likely reject *Grimm* in the future. Instead, "[t]he bottom line is that *Grimm* is binding until the Supreme Court tells us otherwise." *Id.* at *11.

Plaintiffs assert that the Supreme Court in *B.P.J.* "rejected the legal premise underlying *Grimm*," Pls.' Mem. 20, Dkt. No. 16-1, but the Fourth Circuit "do[es] not lightly presume that the law of the circuit has been overturned." *United States v. Hunt*, 123 F.4th 697, 702 (4th Cir. 2024), *cert. denied*, 145 S. Ct. 2756 (2025). Rather, a "Supreme Court decision overrules or abrogates [its] prior precedent only if [the] precedent is *impossible* to reconcile with that decision." *Id.* (citing *Short v. Hartman*, 87 F.4th 593, 605 (4th Cir. 2023)). "If it is possible [] to read [the Fourth Circuit's] precedent harmoniously with Supreme Court precedent," courts in the Fourth Circuit "must do so." *Id.*; *see also Doe v. Sidar*, 93 F.4th 241, 245-246 (4th Cir. 2024).

Under this standard, Plaintiffs must show that it is *impossible* to reconcile *Grimm* with *B.P.J.* Plaintiffs fail to clear that high bar. The Supreme Court in *B.P.J.* was crystal

clear that its analysis was limited to the "distinctive sports context." 146 S. Ct. at 2377; *see also id*. at 2372 ("we also must recognize the distinctiveness of competitive sports"); *id.* at 2376 ("the sports context is again crucial"); *id*. at 2378 ("[e]specially in the sports context"); *id*. ("[i]n the sports context"); *id*. ("[p]articularly in the sports context"); *id*. at 2381 (emphasizing "the nature and reality of sports"). As discussed below, neither *B.P.J.*'s holding nor its reasoning regarding the "distinctive sports context" necessarily applies to the materially different context of school restrooms. Because the two decisions are easily reconcilable, "*Grimm* remains the law of this Circuit and is thus binding on all the district courts within it." *Doe*, 2025 WL 2375386, at *8.

### A. *B.P.J.* Did Not Abrogate *Grimm*'s Title IX Holding.

According to Plaintiffs, B.P.J. rejected *Grimm*'s legal premise that the term "sex" in Title IX includes gender identity. Pls.' Mem. 14. But Plaintiffs' characterization of *Grimm* fails to engage with the actual reasoning of the opinion, which turned on the meaning of "on the basis of" and "discrimination"—not the meaning of "sex."[2] *Grimm* held that a

---

[2] Plaintiffs also misstate *B.P.J.*'s holding with respect to the definition of "sex." *B.P.J.* held that the word "sex" in Title IX and its athletic regulations refers to "biological sex," "particularly in the sports context." 146 S. Ct. at 2371. That is because Title IX and its regulations allow for "separate sports teams precisely because of the biological differences between the sexes—namely, the inherent physical differences between biological women and biological men." *Id.*; *see id.* at 2401 n.14 (Sotomayor, J., concurring in the judgment in part and dissenting in part) (noting that the majority's definition was limited to the sports context); *id*. at 2403 (Jackson, J., concurring in the judgment in part and dissenting in part) (same). As explained below, the reasons B.P.J. gave for defining "sex" as limited to "biological sex" in the context of sports simply do not apply to restrooms, so the meaning of "sex" when used in the text of sex-separated restrooms may well be different from the meaning of "sex" when used in the context of sex-separated athletics. *See Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 595-596 (2004) (observing that the word "age" has

school policy categorically excluding a transgender boy from the boys' restroom violates Title IX. The court explained that Grimm's Title IX challenge turned on "whether the [school] acted 'on the basis of sex,' and if so, whether that was unlawful discrimination that harmed Grimm." *Grimm*, 972 F.3d at 616. The court then held that Grimm had established both elements.

As to whether the Board's actions were "on the basis of sex," the court held—in accordance with *Bostock v. Clayton County*, 590 U.S. 644 (2020)—that, even if the definition of "sex" in Title IX was understood to mean "biological sex," Grimm's exclusion from the boys' restroom would still be "on the basis of" sex under Title IX. Applying *Bostock*, the Fourth Circuit explained that discrimination "on the basis of sex" occurs whenever sex is a "but for" cause of the discriminatory treatment, even if it is not the sole cause. Thus, the Fourth Circuit held that Grimm's exclusion from the boys' restrooms was "on the basis of sex" because "[e]ven if the Board's primary motivation in implementing or applying the policy was to exclude Grimm because he is transgender, his sex remains a but-for cause for the Board's actions." *Id.* at 616-17.

With respect to whether the exclusion constituted unlawful discrimination that caused Grimm harm, the Fourth Circuit held—again in accordance with *Bostock*—that "[i]n the Title IX context, discrimination 'mean[s] treating that individual worse than others who are similarly situated'." *Grimm*, 972 F.3d at 618 (quoting *Bostock*, 590 U.S. at 657). The Fourth Circuit then explained that "*Grimm* was treated worse than students with whom

different meanings in the ADEA depending on whether it refers to old age or bona fide occupational qualifications).

he was similarly situated because he alone could not use the restroom corresponding with his gender." *Id.* Being excluded from the restrooms used by students with the same gender identity prevented Grimm from fully participating in school activities and inflicted a wide array of physical, emotional, and dignitary injuries. *See id.* at 617-18.

Finally, the Fourth Circuit held that the school's policy was not immunized by a Department of Education regulation that allows schools to provide "'separate toilet, locker room, and shower facilities on the basis of sex,' so long as they are 'comparable' to each other." *Id.* at 618 (quoting 34 C.F.R. § 106.33). The Fourth Circuit explained that because a regulation cannot conflict with its underlying statute, the restroom regulation "cannot override the statutory prohibition against *discrimination* on the basis of sex." *Id.* "All it suggests is that the act of creating sex-separated restrooms in and of itself is not discriminatory," not that schools may regulate access to those restrooms in a manner that harms students by treating them unequally. *Id.*

Each step of the Fourth Circuit's Title IX analysis in *Grimm* can be easily reconciled with *B.P.J.* First, *B.P.J.* is fully consistent with *Grimm*'s reliance on *Bostock* to determine whether a particular action has been taken "on the basis of" sex for purposes of Title IX. As Justice Gorsuch noted in his concurrence, *Bostock* "is consistent with the course the Court takes today" because "the Court does not question that 'on the basis of' is perhaps but a synonym for 'because of' and thus does not require biological sex to be the sole cause of discrimination, just as we held in *Bostock*." *B.P.J.*, 146 S. Ct. at 2384 (Gorsuch, J., concurring).

*B.P.J.*'s analysis of the meaning of "discrimination" in the context of sports does not conflict with *Grimm*'s analysis of the meaning of "discrimination" in the context of restrooms. *B.P.J.* emphasized that any implementation of Title IX's prohibition on discrimination "must recognize the distinctiveness of competitive sports." *B. P. J.*, 146 S. Ct. at 2372. In particular, the Court said that sex separation in sports is justified by "inherent physical differences between the sexes" relative to competitive advantage and safety, and the fact that sports are generally zero sum. *Id.* According to the Court, allowing a transgender girl to participate on a girls' team inherently takes a spot away from a cisgender girl. "That hard reality of sports cannot be ignored or swept under the rug. On the contrary, that reality must and does inform interpretation of" Title IX's prohibition on discrimination in the context of sports. *Id.* In the zero-sum context of sports, Title IX "cannot and do[es] not guarantee every student a spot on the team's roster." *Id.* at 2373.

Neither of those "distinctive[]" features of school sports applies to restrooms. First, unlike sports, school restrooms are not separated due to any biological differences relevant to using a restroom but rather based on social norms related to gender presentation and privacy. As the Fourth Circuit noted, transgender students, like other students, use the bathroom "by entering a stall and closing the door." *Grimm*, 972 F.3d at 613. And as Judge Wynn explained, forcing transgender students to use restrooms based on their sex assigned at birth "would, on balance, harm student privacy interests more than it helped them" because "Grimm's entire outward appearance was male." *Id.* at 623 (Wynn, J., concurring). Second, unlike sports, access to school restrooms is not a scarce resource that has to be allocated in a zero-sum manner to some students and not others. Everyone has the same

need to use restrooms, and allowing one student to use a common restroom does not prevent another student from doing so. Thus, the Supreme Court's conclusion in *B.P.J.* that Title IX's prohibition on discrimination must account for the distinctive aspect of school sports does not abrogate *Grimm*'s holding about what constitutes discrimination in the context of restrooms.

Finally, *B.P.J.* does not undermine *Grimm*'s holding that the regulation authorizing separate restrooms cannot override Title IX's underlying statutory prohibition on discrimination. *B.P.J.* emphasized that the athletics regulations (unlike the restroom regulation) have a specific separate statutory basis authorizing a unique understanding of discrimination in the context of athletics. The Court focused on the fact that Congress had—though a statutory amendment to Title IX known as the "Javits Amendment"—specifically directed the then-Department of Health, Education, and Welfare (HEW) to promptly issue "regulations implementing the provisions of" Title IX, "includ[ing] with respect to" "athletic activities reasonable provisions considering the nature of particular sports." Education Amendments of 1974, Pub. L. No. 93-380, § 844, 88 Stat. 484 (1974). Pursuant to that specific statutory authorization, HEW promulgated athletic regulations that authorized "separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b).

Thus, the athletics regulations in *B.P.J.* stand on a different footing from the restroom regulations in *Grimm*, which had no similar statutory basis. Through the Javits Amendment, the text of Title IX "anticipates and approves single-sex . . . sports teams in

school settings; it does not treat them as unlawful discrimination." *B.P.J.*, 146 S. Ct. at 2384 (Gorsuch, J., concurring). In other words, while discrimination in Title IX normally means treating an individual worse in a way that harms them, there are some sports policies that, because of the Javits Amendment, do not constitute discrimination for purposes of Title IX even though they treat individuals worse and inflict harm (e.g. offering volleyball to girls but not boys; offering football to boys but not girls). But because there is no similar statutory provision in Title IX regarding restrooms, there is no authority for agency regulations to depart from the traditional definition of discrimination in restricting access to restrooms. Thus, although *B.P.J.* held that some sports policies harming transgender students are not "discrimination" by virtue of the Javits Amendment, *B.P.J.* does not abrogate *Grimm*'s holding that Title IX prohibits restroom policies that treat transgender students "worse" by excluding them from restrooms consistent with their gender identity.

Although they failed to raise the argument in their opening brief, Plaintiffs may argue in reply that the restroom regulations have a statutory grounding in Title IX's exception for sex-separated living facilities, 20 U.S.C. § 1681. *See Grimm*, 972 F.3d at 634-635 (Neimeyer, J., dissenting) (suggesting a connection between the restroom regulation and section 1686). But that is squarely contradicted by the administrative record when the restroom regulation was promulgated. *See* Nondiscrimination on the Basis of Sex in Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance, 40 Fed. Reg. 24127, 24141 (June 4, 1975) (identifying the restroom regulation as implementing only Sections 901 and 902 of the Education Amendments Act of 1972, now codified at 20 U.S.C. §§ 1681 and 1682, not Section 906, now codified as 20 U.S.C.

§ 1686). The only regulation implementing the statutory provision for living facilities was the provision on "Housing," now codified at 34 C.F.R. § 106.32.

The oral argument in *B.P.J.* confirms that the Court did not understand its interpretation of the Javits Amendment to automatically apply to the restroom regulation. At argument, the Solicitor General warned the Justices that a decision based on the Javits Amendment (which is how the Court ultimately ruled) would not be broad enough to cover sex-separated facilities because there was no similar statutory foundation for separate restrooms. *See B.P.J.* transcript of oral argument at 51:10-15[3] ("[Locker rooms and showers aren't covered by any of the things you just identified, not the living facilities provision, not the Javits Amendment. None of those things covered locker rooms and showers."). In response, Justice Barrett stated that the Court could "[s]ave locker rooms and all of that for a different day" because "I think it opens a huge can of worms that maybe we don't need to get into here because the Javits Amendment and the concessions here." *B.P.J.* Tr. 56:19-20, 57:10-13.

Ultimately, despite the Solicitor General's prompting, the Supreme Court wrote a narrow decision resolving *B.P.J.* based on the statutory authorization provided by the Javits Amendment while leaving questions about restrooms and locker rooms "for a different day." *B.P.J.* Tr. at 57:10-13. The Fourth Circuit has made clear that until that day arrives, "*Grimm* remains the law of this Circuit and is thus binding on all the district courts within it." *Doe*, 2025 WL 2375386, at *8.

---

[3] Supreme Court of the United States, Transcript of Oral Argument, *West Virginia v. B.P.J.* 146 S. Ct. 2356 (2026) 24-43_ihdj.pdf.

## B. *B.P.J.* Did Not Abrogate *Grimm*'s Equal Protection Holding

In addition to its Title IX holding, *Grimm* held that a school's policy categorically excluding transgender students from restrooms consistent with their gender identity triggered heightened scrutiny under the Equal Protection Clause and was not substantially related to the government's asserted interest in protecting student privacy. Just as *B.P.J.* did not abrogate *Grimm*'s reasoning or holding with respect to Title IX, it also did not abrogate *Grimm*'s reasoning or holding with respect to equal protection.

First, nothing in *B.P.J.* undermines *Grimm*'s holding that a policy separating school restrooms and locker rooms by "biological gender" triggers heightened scrutiny, both because it classifies based on sex and because it discriminates based on transgender status. As to sex-based classifications, *B.P.J.* reaffirms that a policy separating students based on "biological sex" is a "sex-based classification that triggers intermediate scrutiny." *B.P.J.*, 146 S. Ct at 2374. As for *Grimm*'s holding that transgender status is a quasi-suspect classification, *Grimm,* 972 F.3d at 607, *B.P.J.* conspicuously declined to resolve that issue. *B.P.J.,* 146 S. Ct. at 2389 n.3 (Sotomayor, J., concurring in part and dissenting in part). In the absence of any contrary ruling by the Supreme Court, the Fourth Circuit's holding that discrimination based on transgender status triggers heightened scrutiny remains good law. *Cf. Doe*, 2025 WL 2375386, at *10 (explaining that because *Skrmetti* did not resolve whether transgender status is a quasi-suspect class, *Grimm*'s holding remains the law of the Circuit).

Second, *B.P.J.*'s application of heightened scrutiny to sex-separated sports is easily reconcilable with the Fourth Circuit's application of heightened scrutiny to sex-separated

restrooms. *B.P.J.* held that excluding a transgender girl from a girls' sports team was substantially related to an important governmental interest in fairness and safety. But, as with its analysis of Title IX, the Court in *B.P.J.* explained that its equal protection analysis turned on two distinctive aspects of sports—neither of which applies to school restrooms.

Once again, as the *B.P.J.* Court highlighted, sports are distinct because they are zero sum. According to *B.P.J.*, because the participation of one student on a sports team necessarily requires the exclusion of another, "every [birth-assigned] male who makes the team takes a roster spot from a [cisgender] female athlete." 146 S. Ct. at 2375. In light of that "hard reality," *id.* at 2372, *B.P.J.* held that excluding transgender girls from girls' teams was substantially related to the governmental interest in promoting equal athletic opportunity between birth-assigned males and birth-assigned females, *see id.* at 2374-2375. But as discussed above, restrooms are not a scarce zero-sum resource that are allocated to some students and not others. Thus, while *B.P.J.* concluded that the harm to transgender students excluded from school sports was justified by the overall governmental interest in providing equal athletic opportunity, there is no similar justification for harming transgender students (or anyone else) by excluding them from school restrooms.

*B.P.J.* also highlighted, and the parties agreed, that sports is one of the rare contexts in which separate treatment can be justified by biological sex-based differences. By contrast, *Grimm* found the most relevant basis for sex-based separation of restrooms is gender identity and presentation, as opposed to biological differences. As *Grimm* explained, "[t]he overwhelming thrust of everything in the record," including Gavin Grimm and his doctors' testimony, is that "Grimm was similarly situated to other boys, but

was excluded from using the boys restroom facilities based on his sex-assigned-at-birth." *Grimm*, 972 F.3d at 610. Transgender boys and girls use the restroom "by entering a stall and closing the door," and by "minding their own business like any other student." *Id.* at 613-614 (citations omitted). In a future case, the Supreme Court may agree with the Fourth Circuit or it may not, but in the meantime, *B.P.J.* does not compel the conclusion that the biological differences relevant to athletics are also relevant to restroom use, particularly where biological differences that may be seen under one's clothes are not apparent when fully clothed students use the school restroom.

To be sure, Plaintiffs in this case also bring claims related to locker rooms, which (unlike restrooms) may involve students being in states of undress. But many uses of locker rooms involve students changing for gym without any actual exposure to students undressing, and experience has shown that there are many non-discriminatory ways to maintain student privacy without banishing transgender students from the facilities. *See e.g., M.A.B. v. Bd. of Educ. of Talbot Cnty.,* 286 F. Supp. 3d 704, 709 (D. Md. 2018) (locker rooms had "partitioned stalls for changing clothes"); *Doe v. Boyertown Area School Dist.*, 897 F.3d 518, 524 (3rd Cir. 2018) (locker rooms had "single-user showers which have privacy curtains" and no "gang showers"); *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 766 (7th Cir. 2023) (there were "stalls in the locker room to change in privacy").

For all these reasons, the equal protection holdings in *B.P.J.* and *Grimm* are far from irreconcilable. Rather, the two cases applied heightened scrutiny to two dramatically different contexts. "We do not know what the Supreme Court will say—or not say—in any

future decision" that squarely addresses exclusions of transgender boys and girls from boys' and girls' restrooms. *Cf. Doe*, 2025 WL 2375386, at *9. Until then, this Court is bound by the Fourth Circuit's answer in *Grimm*.

## II. NEITHER TITLE IX NOR THE EQUAL PROTECTION CLAUSE MANDATES THAT TRANSGENDER BOYS AND GIRLS BE EXCLUDED FROM RESTROOMS ALIGNED WITH THEIR GENDER IDENTITY.

Even if Plaintiffs could carry the heavy burden of showing that *Grimm* has been abrogated by *B.P.J.*, that would still not establish a likelihood of success on the merits of their claims. Plaintiffs would have to show not only that Title IX or the Equal Protection Clause *allow* schools to exclude transgender students from restrooms consistent with their gender identity, but that Title IX or the Equal Protection Clause *require* schools to do so. No court has issued such a holding, and every court to consider such arguments has rejected them. This Court should do the same.

### A. Title IX Does Not Require Schools to Exclude Transgender Students from Restrooms Consistent With Their Gender-Identity.

Title IX's restroom regulation states that schools "may provide separate toilet, locker room, and shower facilities on the basis of sex," 34 C.F.R. § 106.33, but that regulation "is permissive—Title IX does not require that an institution provide separate privacy facilities for the sexes." *Boyertown*, 897 F.3d at 533. "[J]ust because Title IX authorizes sex-segregated facilities does not mean that they are required, let alone that they must be segregated based only on biological sex and cannot accommodate gender identity." *Parents for Priv.*, 949 F.3d at 1227.

Title IX applies only to discrimination on the basis of sex. But a school district policy of allowing transgender students to use restrooms consistent with their gender identity on a case-by-case basis does not subject anyone to disparate treatment, on the basis of sex. *See C.G. v. Deerfield Public Schools District 109*, 2026 WL 2655117, at *5 (N.D. Ill. Sept. 9, 2026) (holding that a cisgender plaintiff failed "to allege any sex based discrimination" in a "policy [that] allows equal access for students to all facilities that align with their gender preferences"). At most, it provides disparate treatment on the basis of gender identity—people with a male gender identity may use the boys' room, but people with a female gender identity may not, and vice versa. *See id*. If, as Plaintiffs contend, the term "sex" in Title IX does not include gender identity, then regulating access to restrooms based on gender identity is also, by definition, not disparate treatment on the basis of sex.

Moreover, Plaintiffs' assertion in their motion for preliminary injunction that the policy harms only birth-assigned females is contradicted by their Complaint, which acknowledges that the policy applies uniformly to both the boys' and girls' restrooms. *See* Compl. ¶ 69 at 16, Dkt. No. 1 ("Cabarrus County Schools' officials uniformly implement a district-wide practice of permitting students to access intimate and private facilities based on gender identity rather than biological sex."). As the Third and Ninth Circuits have both held, a policy allowing "all students to use bathrooms and locker rooms that align with their gender identity" does not discriminate based on sex against either boys or girls.

*Boyertown,* 897 F.3d at 535; *Parents for Priv*. 949 F.3d at 1228; *see also C.G.*, 2026 WL 2655117 at *5.[4]

Without any grounding in the plain text of the statute or its regulations, Plaintiffs' argument that Title IX compels the exclusion of transgender boys from boys' rooms and transgender girls from girls' restrooms would also violate the "clear notice" required for Spending Clause statutes. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981). Since the Supreme Court's decision in *B.P.J.*, courts have consistently held that Title IX does not provide clear notice that school districts must prohibit transgender girls from participating on girls' sports teams. *See State of Minnesota v. Trump*, 2026 WL 2295012, at *15 (D. Minn. Aug. 10, 2026); *U.S. v. California Interscholastic Federation*, 2026 WL 2575930, at *9 (C.D. Cal. Aug. 31, 2026); *Brown v. Washington Interscholastic Activities Association*, 2026 WL 2525463, at *24 (W.D. Wash. Aug. 23, 2026). If Title IX after *B.P.J.* does not provide clear notice that transgender students must be excluded from sports teams consistent with their gender identity, then it certainly fails to provide clear notice that they must be exclude from restrooms.

---

[4] Plaintiffs have not advanced an argument that allowing transgender boys and transgender girls to use locker rooms consistent with gender identity constitutes sex discrimination in the form a hostile educational environment. Such an argument has been unanimously rejected by the Courts of Appeals to address the issue because "the presence of transgender people in an intimate setting does not, by itself, create a sexually harassing environment." *See Parents for Privacy*, 949 F.3d at 1227 (citations omitted); *Boyertown*, 897 F.3d at 531, 534-536; *Cruzan v. Special Sch. Dist. No.1*, 294 F.3d 981, 984 (8th Cir. 2002).

### B. The Equal Protection Clause Does Not Require Schools to Exclude Transgender Students from Restrooms Consistent with Their Gender Identity.

Plaintiffs' equal protection claim fails for similar reasons as their Title IX claim. Allowing transgender students to use restrooms consistent with their gender identity does not trigger heightened scrutiny because it does not entail any disparate treatment on the basis of sex. *See C.G,* 2026 WL 2655117 at *4 (holding that a trans-inclusive facility access policy "'contains *no classification whatsoever*'" that would trigger heightened scrutiny") (emphasis in original). Plaintiffs allege that the policy "operates asymmetrically in practice" because, according to Plaintiffs, there are no transgender boys who currently us the boys' restrooms. Pls.' Mem. 18, Dkt. No. 16-1. But they recognize that the policy itself applies equally to boys and girls. Compl. ¶ 69 at 16, Dkt. No. 1. Thus, theirs is fundamentally a claim that a facially sex-neutral policy has a disparate *impact*. And, absent any discriminatory intent, disparate impact alone does not trigger heightened scrutiny under the Equal Protection Clause. *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979).

Plaintiffs have failed to allege any discriminatory purpose that would trigger heightened scrutiny. Plaintiffs allege that "Defendants' policies and practices subject Plaintiffs to intentional discrimination on the basis of sex by placing the asserted interest of biological male students in using female designated spaces above Plaintiffs' interest in bodily privacy when using those spaces." Pls.' Mem. 17, Dkt. No. 16-1. But discriminatory intent under the Fourteenth Amendment requires more than "awareness of consequences." *Feeney*, 442 U.S. at 279. It requires "that the decisionmaker . . .selected or reaffirmed a

particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* Plaintiffs have failed to produce any evidence—or even allege—that Defendants acted based on a desire to harm cisgender girls as compared to cisgender boys, which would be needed for their sex discrimination theory. Rather, all evidence indicates that the school district acted to protect the health and wellbeing of students and, at most, did so "in spite of" the alleged harm to Plaintiffs', not because of it.

Because there is no facial classification and no discriminatory intent, the school district's policy is subject to rational basis review and must be upheld if there are "plausible reasons for the relevant government action." *United States v. Skrmetti*, 605 U.S. 495, 522 (2025) (citations omitted). The school's policy easily survives rational basis review because allowing transgender boys and girls to use the restrooms and locker rooms that align with their gender identity on a case-by-case basis—while providing additional options for students who wish for greater privacy—is rationally related to the governmental interest in protecting the health and wellbeing of transgender students and preventing discrimination against them. *See Parents for Privacy* 949 F.3d at 1238 (holding that allowing transgender students to use restrooms and locker rooms consistent with their gender identity "is rationally related to the legitimate purpose of protecting student safety and well-being, and eliminating discrimination on the basis of sex and transgender status"). It is similarly rational for a school to conclude that *forcing* transgender students to use separate facilities imposes unique harms that are not comparable to the harm faced by cisgender students who *choose* to use separate facilities to avoid encountering transgender students. *See Boyertown*, 897 F.3d at 530 ("Nothing in the record suggests that cisgender

students who voluntarily elect to use single-user facilities to avoid transgender students face the same extraordinary consequences as transgender students would if they were forced to use them"). As Chief Judge Diaz recognized in *Doe* there is a "shame and indignity" in a student "being singled out based on his transgender status." *Doe*, 2025 WL 2375386, at *11 (Diaz, C.J., concurring). Because "school is the central organizing feature of [students'] day-to-day life," barring a transgender student "from boys' restrooms for most of his waking hours is to demean him, day-in and day-out, with no end in sight." *Id* at *12. Indeed, the plaintiff in *Grimm* experienced stress so unbearable he was hospitalized for suicidal thoughts. *Grimm*, 972 F.3d at 617. The school district could rationally conclude that allowing transgender students to use facilities consistent with their identity on a case-by-case basis would prevent these harms, and that the privacy interests of cisgender students uncomfortable with sharing restrooms could be addressed by providing greater privacy options rather than categorically excluding transgender students from the facilities.

Indeed, even if permitting some transgender students to use restrooms and locker rooms aligned with their gender identity triggered heightened scrutiny, it would be upheld. The district's policy is substantially related to the important governmental interest in creating a "safe, respectful and non-discriminatory environment" for transgender students. Compl. ¶ 73 at 18, Dkt. No. 1; s*ee also Boyertown* 897 F.3d at 527-528 (concluding that allowing transgender students to use restroom and locker rooms consistent with their gender identity "served a compelling interest—preventing discrimination against transgender students—and was narrowly tailored to that interest").

**CONCLUSION**

The motion for a preliminary injunction should be denied.

Dated September 11, 2026

Respectfully submitted,

/s/ Daniel K. Siegel

Daniel K. Siegel
NC Bar No. 46397
ACLU OF NORTH CAROLINA
LEGAL FOUNDATION
P.O. Box 28004
Raleigh, NC, 27611
919.592.4630
dsiegel@acluofnc.org

*Counsel for Proposed Amici Curiae*

Joshua Block*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St.,
New York, NY 10004
212.549.2593
jblock@aclu.org

Eleanor Matheson*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th Street NW,
Washington, DC 20005
929.819.3979
ematheson@aclu.org

*Appearing by special appearance pursuant to L.R. 83.1(d)

## WORD COUNT CERTIFICATION

Pursuant to Local Rule 7.3(d), I hereby certify that the foregoing brief contains 6,108 words excluding the parts of the brief exempted by the Local Rule.

/s/ Daniel K. Siegel
Daniel K. Siegel

*Counsel for Proposed Amici Curiae*